I am Alexandra Manbeck, attorney for the appellant. I would like to bring to the court attention the fact that the district court rendered its opinion denying the appellant's case before this court issued the case of Reveld v. Berryhill. And the case Reveld v. Berryhill clarified the standard for a finding of disability based on fibromyalgia. So because of the new cases that clarify the standard for fibromyalgia, I respectfully submit that the appellant should be found disabled on that basis because the district court, when it rendered its opinion, did not have the guidance of this court with respect to some of the standard. And I also submit that with respect to the earlier standard which this court touched on in Bennett v. Berryhill in 2003, these standards are also met by the claimant. But when you say standard, are you referring to the 11 or more tender points? Yes, Your Honor. Let me ask you about that. Because in your brief, you assert at eight appointments in 2012 and 2013, the claimants had 11 or more tender points. I don't see that. I don't see the evidence that supports that. When I looked at all the doctor reports, I saw a maximum of one that might have used tender points and didn't report 11. So can you point me to what evidence there is in the record to support that statement? The 11, the doctor, Dr. Cohen, was not very clear, Your Honor, when he ---- He's the only one that made specific reference to trigger point tenderness. And he didn't come up with 11. He came up with a list which you turned into 11, but he doesn't come up with 11. That's what I'm saying, Your Honor. He was not clear on ---- because he was just a treating doctor. He was not really looking through the law in specifying. But who was clear? Because none of the others appeared to use a tender point measure, as best I can tell. What other doctor comes closer to what you've asserted in your brief? The new standard in Weavell v. Berryhill is a second set of standard that does not rely on tender point, Your Honor. That was the old rule before the court came up with SSL 12P in 2012 and 2013, clarifying that you don't have to rely on only the 11 tender point, Your Honor, that there's a second set of criteria. Which I don't see applied in your brief either. You assert it, but I don't see any record evidence that's cited that shows how the second standard is met. So maybe you can point me to what evidence in the record you think established that the second alternative standard is met. Okay. I just read to you from your brief about eight times the tender points were found, and I asked you to point to places in the record, and you haven't done that. So unless you have something else to point to, I'll just have to take as a given, there isn't anything in the record that supports that assertion. And so I'm now trying to find out what else might be supported. Okay. The first criteria required a 12 tender point, and like Your Honor say, that Dr. Coleman did mention them, but he did not specifically say that these are the tender points. And your brief cites several other doctors who you assert made that finding. But, in fact, when I go to look at the record, they don't seem to talk about the pressure points at all. They just talk more about the general 5-over-by-10. They talk about gain. Right, Your Honor. Including the sites that aren't among the numbered potential pressure points. And so I just don't find the evidence supportive of your statement with regard to that criteria. So do I move to the other one? Yes, Your Honor. I would agree to move to the second set. And it's the second set, just say widespread pain over at least three months, and this, the claimant fully satisfied that because she had the pain that lasts several years now, and then with the emergency admission since the end of 2011 all the way through 2012, 2013. So the three months already are more than met. And then she has repeated manifestation of six or more fibromyalgia symptoms, which we found here. So, like. That's an assertion, and I see where your brief says that. Yeah. But I also don't see a citation to any record evidence that supports that proposition. Oh, it's Revell versus Berwhiel, Your Honor. No, stop. You're giving me law. I'm asking about the record in this case, what evidence there is of your client meeting that qualification. I have no quarrel with the qualification, with the criteria, but I'm asking you very specifically and pointedly what record evidence established that your client satisfies that qualification, and I'm yet to hear the first answer other than the general reference to Dr. Noland. Right. The second set of criteria require widespread pain, which pain all over her body. That's not in dispute, Your Honor, that lasts over more than three months. And then repeated manifestation of six or more fibromyalgia symptoms, like manifestation of fatigue, and she has that throughout the whole record. Cognitive or memory problems, fibromyalgia, walking, depression, anxiety disorder, and here it says irritable bowel symptoms. She has repeated problems with. And I ask you more than once now, where in the record, and the answer you've given me is throughout the whole record, which really isn't much of an answer. I haven't. I looked, and I did not find the evidence that supported the proposition that it's been documented. Your client suffered from the repeated manifestation of six or more symptoms. Did the ALJ engage with the second criteria, with the 2010 criteria? I'm sorry, Your Honor? Did the ALJ engage with the second? No, the ALJ never considered the second set, Your Honor. The ALJ only considered the first set. How about the expert that testified at the administrative hearing? Did he assess her under the 2010 criteria? He only considered the old criteria, which is the 12 tender points, and then if there was no 12 tender points visible or obvious, then he should say there's no fibromyalgia. He never considered the second set, and neither did the district court, Your Honor. And so that is another line of argument we present, because she more than fulfilled the second set with anxiety, depression under Dr. Henderson's treatment. The anxiety, depression, the mental problem, that's in the record. There's no dispute as far as depression. Your Honor, can you tell us about Dr. Armand's testimony and Dr. Janot's testimony? Dr. Armand? Yeah, the rheumatologist. Will you say found the plaintiff was disabled due to fibromyalgia in June 2012? Oh, yes, Your Honor, that is our- What you say in that AR-325, you say with respect to Dr. Janot, her primary physician, diagnosed her condition as FM, and your record site is AR-779. Do you want to speak to that? I'm sorry. I don't understand your question, Your Honor. Right. In a follow-up to Judge Clifton's questions to you, I'm asking you whether your references in your reply brief show evidence- Yes, Your Honor. Supportive of the condition. Yes, Your Honor. That's what Dr. Janot repeatedly say over the period, the two or three years of treatment. And so if we look at the second set of criteria, she more than-the claimant more than meets the standard for the second set. Has Dr. Armand stated that the plaintiff has widespread pain that has lasted at least three months, pain in her neck, trapezoid, interior side, goes on? Yes, Your Honor. That's-we rely on Dr. Armand's treatment. There's no reference to pressure points there, is there? The second set of criteria does not- That's not the question I asked. Is there any reference by Dr. Armand to pressure points? I don't see it, Your Honor. So the statement in your brief that refers to Dr. Armand as supporting the conclusion that diagnosis based on pressure points is incorrect. No, Your Honor. Let me check here if I can have a minute. Well, your report on page 29 of your opening brief, Dr. Armand found a total of 14 tender points, which more than satisfies the SSR 12-2P's first set of criteria. So I look at Dr. Armand's report, I don't see any mention of those pressure points or tender points. Okay, it's in Exhibit 325, and that's where he states- I'm looking at that page. He reports pain in various areas. Some of those areas don't correspond to the tender points specified in the SSR. And there's no reference that I see in that paragraph to tender point or pressure point analysis at all, but it seems to be listing the self-reported pains identified by your client, which is fine, but it's not the same as the SSR tender point criteria. Your Honor, Dr. Armand must have tested or must have used his own examination to test that this part of the body where she mentioned pain must be tender point, because if they are painful at a certain pressure, then the doctor, based on his diagnosis, would consider them tender point. There's nothing in there that says he did that. There's nothing in there I see that suggests other than a report of what she told him. I don't think so, Your Honor, because he must have examined you. He is a specialist also, so I would trust that he would have touched and filled the claimant and not only rely on her testimony, her statement. So although he did not say tender point- You counted up 14, including, for example, fingers. I mean, you quote from him, you quote in your brief from him, and looking at the chart in the SSR, are fingers an identified tender point site? He identified the pain in- I'll answer my question. Yes, Your Honor. Fingers are not an identified tender point. Well, there are places that are painful, that the doctor decides that are painful, and if he calls them tender point, that his definition versus Social Security- Well, he didn't call them tender points. Versus Social Security- You're calling them tender points. He identified pain in those places, and I'm just saying that's something different than the standards set out in the SSR, and you've abandoned the first set of criteria and tried to move to the second, and yet you keep coming back to the first based on what you read in the doctor's reports, which I have to tell you, I don't read in the doctor's reports. So I ask you, okay, using the second criteria, can you point me to things in the record that document it? And I've got to tell you, so far your answers haven't been very satisfying to me. It's transcript page 325, Your Honor. So that's where he, Dr. Allman, answering to Judge Gossman's question. He lists places where she reports pain that don't correspond to the tender point sites identified in the SSR. Can you show me something else in 325 that shows how she meets the second set of criteria? Okay. The second set just say that manifestation of fatigue and pain, pain all over the body, and 325 pain in all over the body, the neck, the trapezoid, the left, the right side, the back, the thighs, so that last over. That's the first of the three criteria under the second set. The second, she has experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, fibro fog, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome. Can you check off six of those boxes from 325? Yes, Your Honor. I would because these are all the pain in the various aspects of her body, and some of them correspond to the tender point, so there should be more than six fibromyalgia symptoms. And then as far as manifestation of fatigue and cognitive problems, I think that's satisfied by the psychiatric report of Dr. Henderson and Dr. Lesner. Why don't we hear from the you're well over your time, and I realize you've been answering questions by Judge Clifton, but why don't we hear from the government? Yes, Your Honor. Thank you. Good afternoon.  I'm Dr. Asim Modi on behalf of Nancy Bearhill, Acting Commissioner of Social Security. The commissioner's non-disability decision in this case should be affirmed because it is rooted in impartial medical expert testimony, and a record consisting largely of unremarkable. Dr. Lobener? Was that his name? Dr. Warbur, Your Honor. Lober. Warbur, I think. Warbur. Who testified at the hearing? Dr. Warbur, Your Honor. Warbur. I can't pronounce it. I think it's L-O-R-B-E-R. Yes. Yes, Your Honor. That fellow. Yes, Your Honor. That's who you're referring to? Yes, Your Honor. He didn't examine her, did he? No, Your Honor. He's not a rheumatologist, is he? No, Your Honor. Did he even make any reference to the two criteria that are possible under the standards that Social Security has adopted for diagnosing fibromyalgia? So, Your Honor, Dr. Warbur did not reference the second set of criteria established in SSR 12-2P for establishing a diagnosis of fibromyalgia, but two points. First, Dr. Warbur did have the benefit of reviewing the entirety of the record that existed at the administrative level and issued his conclusions based on his review of the entirety of the record. And I think we've spent time sort of discussing the diagnosis of fibromyalgia, but as this Court has repeatedly held, a diagnosis is not proof in itself of disability. Instead, the burden remains on the claimant to show. I hear the ALJ didn't even list fibromyalgia as one of the initial disabling or severe impairments. No, Your Honor, yes, you're correct. The ALJ listed fibromyalgia as one of the non-severe impairments, but fully consistent with agency policy, proceeded past Step 2 when considering her residual functional capacity and considered both the severe and non-severe impairments when determining what functional limitations she had. And fully consistent with both this Court's ruling in Revels and SSR 12-2P, the ALJ's analysis of what limitations stemmed from this condition were based in a review of the longitudinal record. I know that this Court had cautioned in Revels that one of the issues with an impairment like this is that the condition can wax and wane, and it can be sometimes, you can have periods of good days and bad days, and sometimes these findings are isolated. But as Dr. Lorber testified, and as the ALJ noted in detail in the decision, what we have between February 2012 and May 2015, which is the relevant period in this case, we have consistently benign findings throughout this period. As Dr. Lorber testified, the claimant repeatedly had normal gait, strength, and range of motion. As my understanding about fibromyalgia, and I know very little about fibromyalgia, other than what I read in these records and whatnot, it's all about pain, right? Yes, Your Honor. Just because there's a lack of objective manifestation does not mean somebody does not have fibromyalgia. Isn't that right? Yes, Your Honor. It's about the pain through the body. Yes, Your Honor. I think these are, again, two different issues regarding the diagnosis, which is based on sort of subjective reporting of trigger point tenderness in relation to that testing, as Judge Clipton, rather, had outlined. Sure is, Doctor. Of course. And so that is, of course, and even the second part of the criteria, again, relies on subjective reporting of persistent symptoms. And so that relates to the diagnosis. I'm sorry, Your Honor. Let me ask you, again, about the record. So we have in June 2012, Ms. Trong is diagnosed with FM by her primary physician, who noted that she had chronic pain and prescribed her a drug. His notes do not indicate any other specific basis for the diagnosis. He refers her to Dr. Armand, a rheumatologist. In his treatment notes, he notes, this is at AOR 325, that Trong was diagnosed with FM after several visits with the ER and multiple tests. He listed several places where Trong experienced pain, as well as other symptoms including fatigue, depression, and dizziness. It is not clear from the notes that he conducted a tender point examination. In March 2013, Trong saw Dr. Cohen, another rheumatologist. His records indicate at AOR 823, evidence for trigger point tenderness, trapezius muscles, epicondyles. I'm obviously not a doctor. Elbows, lateral aspect hips, medial aspect knees. His notes do not clearly specify how many tender points at each location were present at the time. He also indicated that Trong experienced non-restorative sleep. Then in 2013, she began seeing an internist. And it is unclear, of course, from his record, whether there was any tender point. But he noticed decreased range of motion of the left index finger. When you take this all together, and again looking at the 2012 criteria, which the district court did not have the benefit of, as sort of blessed in Ravel's, and was not analyzed by the ALJ, why isn't this record sufficient to establish disability under the second criteria? Your Honor, again, I think the distinction needs to be made between the diagnosis, which is what you outlined, that that criteria, the 2010 criteria set up under the American College of Rheumatology establishes the diagnosis. But the ruling goes on to state about what is necessary to establish, you know, the presence of disabling limitations related to this impairment. What the ALJ considers when determining her residual functional capacity. And in this instance, objective medical evidence is a key part of that determination. Objective what? Objective medical evidence, Your Honor. And Dr. Cohen's note is, I think, especially interesting because he is a rheumatologist and presumably has unique insight into this condition. And Dr. Cohen, again, like most of the physicians who saw, claim it, found normal gait, strength, and range of motion. But perhaps more importantly, Dr. Cohen said, as part of his plan for claimant, said that she should fully participate in work activities, home activities, and extracurricular activities. And he expressly discouraged disability, expressly discouraged narcotic medication usage. And I think that's a key point here because I think distinguishing this case from Rebels, in Rebels they had physicians who repeatedly endorsed the trigger point findings, repeatedly endorsed aggressive forms of treatment, such as having narcotic medication uses, facet injections, epidural steroid injections. Here, as Dr. Cohen noted, the treatment plan was essentially participating in work activities and extracurricular activities. He also recommended daily exercise, meditation, tai chi. Claimant herself testified that her pain medication was comprised of ibuprofen and didn't go beyond that. And for her- But she had other drugs at other times. Yes, Your Honor. But- Her own regimen at various points. Well, Your Honor, I think her regimen also consisted of Zoloft for her psychiatric complaints, and she reported that Zoloft was beneficial for her psychiatric complaints. So it's not necessarily making a value judgment about that. It's more comparing this case to the treatment found in Rebels and what this Court criticized in Rebels. And here the circumstances are entirely different. I mean, if you look at Rebels and the spirit of Rebels, which says the diagnosis of FM does not rely on X-rays or MRIs. SSR 12-2P recognizes that the symptoms wax and wane and that a person may have bad days and good days. So we have not had an analysis by the ALJ or application of SSR 12-2P. You agree with that? Your Honor, the ALJ doesn't- Is that true? Is that- No, I disagree with that, Your Honor, because I think the ALJ completely followed the spirit of SSR 12-2 and that he looked at the entire longitudinal record, which is what the ruling in Rebels outlines, and considered the existence, the principle of good days and bad days existing, and noted that when you look at the totality of the record, which both the medical expert and the ALJ did, that, for lack of a better word, the good days far outweighed the bad days. Wasn't he really focusing on the issue of 11 or 12 tender points and absence thereof? Again, that relates to the diagnosis, Your Honor, but when we were talking about the actual limitations that flow from the impairment, the burden remains on the claimant to show that she had objective evidence of the limitations. The Social Security Act requires claimants to show that they have evidence of a disability, and they have to show the objective evidence that they are, in fact, disabled, and nowhere is there an exception to that rule for an impairment like fibromyalgia. And here, based on the evidence that was present in the record, the ALJ looked at it all, looked at all the normal gait, strength, range of motion, motor skills, coordination, found repeatedly, and it's noted in the decision, throughout March 2012 to the date of the decision in 2015, that all of this was normal throughout, and reasonably determined, based on those benign findings, that she could, in fact, perform a range of medium work. And so the ALJ, I think, with the assistance of the impartial medical expert, properly complied with what SSR 12-2P requires of adjudicators when evaluating fibromyalgia. There really is no discussion in his decision, or in the decision, about the second part, the 2010 criteria. Isn't that correct? That relates, again, Your Honor, to the diagnosis. There's not an explicit discussion. I looked for it, and I didn't see it. You're correct, Your Honor. When it came to the diagnosis itself, that explicit discussion was not there. But when it came to the evaluation of what limitations flowed from that impairment, and what, if any, the ALJ did follow SSR 12-2P in considering the on-chemo record. The one thing that sort of bothered me a little bit about this is the ALJ placed considerable emphasis on the doctor who testified at the hearing. It didn't strike me or seem to me that he gave any weight whatsoever to the opinions of the rheumatologist that had examined her and had treated her. I mean, that doesn't seem to be correct. But I think here, Your Honor— Even if you were to say there's contrary opinions, you still have to look at them. It doesn't mean you just totally zero them out as if they don't exist. Your Honor, the sole treating rheumatologist who issued sort of, for lack of a better word, an opinion about her functioning, Dr. Cohen, said that she should fully participate in work. So that's entirely consistent with what the ALJ found. At AR 329, as Judge Katzmann had noted, that was what Dr. Cohen, after examining the claimant, advised for her. So to the extent that the treating rheumatologist's opinion may not have been explicitly mentioned, that statement is entirely consistent with the ALJ's ultimate non-disability determination, Your Honor. Okay. I see my time is up. Any other questions? Okay, thank you. Thank you, Your Honor. I'll give you a minute for rebuttal. Yes, Your Honor. I want to address opposing counsel's last argument that Dr. Cohen fully encouraged the claimant to return to work. If you read the statement, it says here that it's a treatment plan, and he has a whole list. He encouraged full participation, work, home, extracurricular activity, relaxation, restful sleep, gentle massage, ice and heat, exercise. So it's like the whole kitchen sink, let's say, which means stay active. It doesn't mean the way that opposing counsel said it. It's like she has to go back to work, or she should go back to work. And this is not the case, Your Honor. If you look at transcript 1200, it's the whole list of things. And in that context, Dr. Cohen just wants to encourage the claimant to be active in whatever means. If she cannot work, she'll be exercising at home, relax, sleep well, massage, do whatever she can, but not be stationary. That's all you can get from that, and not just a statement about she should go back to work like opposing counsel said, Your Honor. Thank you. Thank you. Thank you, counsel. We appreciate your arguments this afternoon. And that matter is submitted and ends our session for today. Thank you.
judges: Paez, Clifton, Katzmann